Good morning, Your Honors, Counsel. My name is Amy Turnbow. I'm on behalf of the Respondent-Employer in this matter, John Keno and Company. The employer respectfully requests that this Honorable Court reverse the Commission's decision as being against the manifest weight of the evidence. The basis for that is this Court has long settled that in order for an employee to provide evidence and substantiate the entitlement to a wage loss, two things have to, two prongs have to be satisfied. First and foremost, the employee has to establish that they have had a partial incapacitation, which prevents them from returning to their usual and customary line of employment. And second, that there has been evidence submitted by the employee that he's had an impairment in earnings. In this particular case, this employee failed both prongs, but I will also argue, assuming arguendo, that he met the burden of the first prong, he failed the burden of the second prong. From the employer's perspective, there's ample evidence in the record that, quite frankly, the Commission should never have decided the way they did to begin with. This particular employee, at the time that he was released after his functional capacity evaluation in June of 2004, was released by his treating physician, Dr. Cole, to a medium level capacity with permanent restrictions. The employer does not disagree in that capacity at all. However, Ms. Schmidt, who was the vocational counselor and has had 23 years' experience in physical rehabilitation and vocational assistance, had performed a job analysis of this individual in 2002 of what his job was as a heavy equipment operator for John Keno and Company. And the classification of that job, based upon all of the measurements that she took and put together in the report and her analysis of that, was that it met the light physical demand level. And he's released immediately. Correct, by the FCE and by the statements and testimony of Dr. Cole. There were permanent restrictions and there were limits placed on the lifting and whatnot, but they did meet the medium level classification, even by Dr. Cole. And Ms. Schmidt had indicated that his heavy equipment operator position was that of a light physical capacity. During her testimony before and during trial, she even stated that her analysis and review of his job analysis that she performed in 2002 and the results of the functional capacity evaluation, all the measurements and testing and findings in those, he could have gone back to his pre-employment job. Obviously, he didn't do that. That's why we're here. There is also evidence in this record that this particular employee was on a path from basically the day he had his accident that he was not going to go back to work as a heavy equipment operator. And I'm going to point to a couple of, two places where he has completed. Are you saying that the evidence shows he should have, that there was not a partial incapacity? I believe that there's evidence shown that there is testimony provided by a credible vocational expert that he was capable of returning to his pre-employment level. There's also evidence that he was not. There is. There is. Dr. Collins, please, said he was surprised he was doing as much as he's doing. Well, Dr. Collins is also, according to even the petitioner, excuse me, the employee, back when he was treating in 2002 in August, which is before his, I believe, even second surgery, and this gentleman had a third surgery, had apparently given the employee some indication of what level of functioning he was going to be able to get to at the end of his treatment road, which is obviously not what ended up happening because Dr. Cole placed him at a higher level than what Dr. Collins had been discussing with the employee earlier on. I also would submit Dr. Cole, as the operating surgeon, should have more credibility than Dr. Collins. That's a commission call. You know, which one of the two they're going to believe is a commission call? So, I mean, do you concede that Collins' testimonial reports or medical records supports the notion that he could not perform in his normal employment? I will say that Dr. Collins' testimony and his records do support that opinion. Okay. Absolutely. I would also submit to you that there are the opinions of the IME physicians, Dr. Friedberg and Dr. Carroll, especially Dr. Carroll, who ended up examining this gentleman in 2006, which is two years after he's released with permanent restrictions, and Dr. Carroll's examination found that this gentleman should undergo a new functional capacity evaluation because his examination of this employee and the testing that he performed and then in reviewing the levels of functioning that were present in that FCE don't match. But you would acknowledge that the first FCE clearly indicated he was unable to perform work as a heavy equipment operator, correct? He does say that. I will submit that the person who is in the best position to understand the job itself and know what the limitations are, frankly, are Ms. Schmidt. She was capable of looking at the job analysis. She was there. She performed it. She saw exactly what this gentleman did as a heavy equipment operator, and she was capable of reviewing the FCE. Dr. Collins didn't have the benefit of the job analysis to know exactly what this gentleman did and that his job for John Keno met a light physical demand level. Where does Entenberg fit into all of this? Doesn't she basically support the judgment of Collins? She does support the judgment of Collins, but her one and a half page report basically says she has no explanations for the findings that she makes. She renders opinions that says he doesn't have transferable skills, he doesn't have, you know, transferable qualifications, his age, et cetera, do not support him being able to do any other activity, basically. And she opines that his employment as a part-time bus driver with 20 hours a week earnings was suitable employment. She did not perform a labor market survey. There's no indication that she went out and looked for available jobs even within the restrictions pursuant to his FCE. Let me ask you this. We have Coravell, which is the voc rehabilitation firm engaged by respondent, and they identified areas of employment, and they did a labor market survey knowing that he was making $39.20 per hour at his union job. The positions at Coravell, your vocational rehabilitation firm that you hired, noted the salary range for the positions they were talking about was between $5 and $15 an hour. So didn't he eventually get hired within the pay rate or pay scale that was within the range recommended by Coravell? I would say it's within the pay scale hourly rate. I'm certainly not going to concede that point because I have a point to make. But to answer your question, he certainly did meet within the dollars per hour aspect of what the Coravell labor market survey provided. However, he chose to take a 20-hour a week part-time employment. I will remind this Court that that labor market survey identified three different types of employment that he was qualified for, and of those three types of employment, at least 24 of those employers were actively hiring full-time employees and several more were anticipating hiring in the near future. This particular employee, as I indicated early on, this gentleman was on a path to not go back to work as a heavy equipment operator. And I'm going to cite to you a couple of things. First and foremost, in his testimony in the record at C-98, early on when he was treating with Dr. Collins in August of 2002, Dr. Collins had released him to light-duty work at that time. And he specifically admitted in his testimony that he made no attempts to look for any light-duty work at that time and specifically stated, I'm not willing to work less than a full-time, full-duty job. Flash forward to June of 2004 when he's released with permanent restrictions pursuant to the FCE and active job placement assistance is provided at this point. Let me take a step back. In September of 2003, Ms. Schmidt first met with Mr. Rausch to take the initial assessment of him. And at that point, she testified, and it was in her report, that he made a statement to her that, well, I'm not sure how this is going to go and I think the only thing I'm going to be able to do is be a part-time bus driver. And there's ample evidence by his actions and his refusal to act that he was on a path to not only work a part-time job so that he could qualify for and get Social Security disability benefits and start receiving his union pension. That's the way you're, you know, that's your spin. That's the way you're categorizing this. This evidence you just referred to was before the commission, before the arbitrator, wasn't it? It was. It's in the record, okay. How do you respond to this bottom-line argument, okay? There's some conflicting evidence here of whether or not claimant was capable of full or part-time work. There is a conflict in the evidence. Why can't the commission resolve that in favor of the claimant? Give us a compelling legal reason why they can't do that here. Frankly, there is no compelling legal reason. I do believe it's, I believe, frankly, it's the commission should never have decided the way they did, even if you take into the consideration just the amount of evidence and testimony that was presented. There is, there's Dr. Cole saying he's capable of full-time work. There's the vocational, not the vocational counselor, Dr. Carroll making opinions that this gentleman is clearly functioning at a higher level than even his previous FCE. Dr. Cole, when he released him with the permanent restrictions in June of 2004, said this gentleman is going to be a bad rehab candidate because he's got a lot of symptom magnification. And I'm submitting that this gentleman, when he testified, admitted that at the time that he was released with permanent restrictions in June of 2004, he'd already started the path to obtain Social Security disability benefits. So if we have conflicting evidence, though, and we overturn the commission on a conflicting evidence situation, are we sort of substituting our judgment for that of the commission? Not if you can actually say that the decision should be, there's no basis in the record to make the decision. If you look at the commission's decision, one of the things that they cite to, in terms of the deciding that he's entitled to a wage differential, is that the respondent failed to offer him a job. Well, this employee never went back to the union to go back to work. When he was hired for John Keno and Associates, he was hired in March of 2001. He'd had 14 years of heavy operating equipment experience through the union. And so his employment with John Keno was from March until he was injured in October. And he did work in several months thereafter before being taken off work. How many years was he working as a heavy equipment worker? At least 14. That was his testimony. And like I said, for this particular employer, that began in March of 2001, and he was injured in October of 2001. When he was released, like I said, the commission states that the employer didn't offer him a job. Well, it's been four years at this point, and it's possible that he didn't have a job or that John Keno may not have existed. I don't know that at this moment, for that. But what my contention is, is him being a union heavy equipment operator with 14 years' experience, why didn't he go back to the union and put his name on the rolls? There's specific testimony that in October or November of 2004, the vocational counselor specifically made an appointment and met with him at the union hall to have his name placed on the light-duty roster, which would pay union scale, which would therefore state that he was not having impairment of earnings, because he would be making union scale based on his experience and where he was pre-injury to then. He absolutely refused and admitted he refused because it would mess up him getting his union pension, and he couldn't work a full-time job because it would mess up his social security disability benefits and the pension. And he failed to cooperate with vocational rehabilitation, which is where I came in. And that was recognized by the commission explicitly, wasn't it? There was some evidence that he failed to fully cooperate. Didn't they explicitly acknowledge that in their decision? No. Actually, they don't. They may have said that he failed to cooperate with VOC, but they gave him maintenance anyway. That's not acknowledging that he failed to cooperate with VOC. If you fail to cooperate with vocational rehabilitation, you shouldn't be entitled to maintenance. And they not only awarded maintenance, they increased it from the arbitrator's original award, in terms of the length of time that he was to receive maintenance benefits. The problem here is that assuming arguendo that you prove that he's got light-duty restrictions that preclude him from going back to his pre-injury job, the requirement to prove someone has an impairment of earnings, this gentleman completely failed to do. He refused to cooperate with VOC. He was on a path and had told the vocational counselor in 2003, before he'd had his third surgery, that he thought the only thing he was going to be able to do is get a part-time bus driver job. This gentleman sought that path. He refused to cooperate with vocational rehabilitation in that, and I won't begrudge somebody taking a vacation, but at the point when he first meets the vocational counselor, he says, I can't cooperate the first two weeks of August because I'm going on vacation. So he takes his two weeks vacation, comes back, they have a meeting, he's set out with a specific number of employee contacts, job leads, et cetera. He's given a directive on the number of job logs to submit. The next meeting, he hasn't done any of those things. He doesn't follow up on the leads that the counselor told him and gave him to follow up on.  And then within a month, he has told the vocational counselor, oh, I found this job, I'm taking the job as the part-time bus driver, and then his wife calls and says, he's not going to cooperate anymore, he took the job. So there's a month where I don't even think it rises to the level of being proper acknowledgement of participating in vocational rehabilitation. He, for all intents and purposes, took himself out of a stable labor market. Well, now, wait, let's talk about that stable labor market. You're saying that there was an appointment made to go to the union hall, put his name on the roll with light-duty restriction that would pay a union scale, right? Correct. Okay. What evidence is there that there's anybody out there that's going to take somebody off that role and give them light-duty work and pay them union scale? Well, the respondent didn't even have an opportunity to establish that as he refused to go and put his name on the roll. You don't know what's there and you don't know what's available if you're not going to put yourself out there to find out what's available. The employer was able to put in at least what the union pay scale was. I would also submit that if they don't have light-duty jobs and they don't have that option, if there are no light-duty jobs in the union, why would they make it an option for you to go down and put your name on the roll for calling for employment? Counsel, we don't have time. For the dues checkoff, in case there is one for the union leadership, that's fine. Thank you. Good morning, Madam Attorney. Please to the court. Counsel, I'm Charles Coleman on behalf of the petitioner defendant here, our appellee here, Michael Roush. And as we know, we're here today because Mr. Roush suffered a severe shoulder injury back in 2001. And it's my perception here that all relevant providers, rehabilitated personnel, perceive that he could not return to his relevant prior employment as a heavy equipment operator. It's actually somewhat of a surprise to me, based on a prior brief, there was no reply brief file, that they are now not conceding that he could not return, that he was not partially incapacitated from pursuing his usual customary life. There was no reply brief file? Excuse me? No reply brief? I received no reply brief. I checked with the court. I never got one. And I at one point called the court. I remember calling the court. And well, that's news to me, to be perfectly honest. I remember calling the court at one point in time after the reply brief was due, and they told me it hadn't been filed. So I'm a little surprised. Had he had prior workers' comp times? Had he had? Not to my knowledge. He disagreed with Dr. Grossman's notes as to what had happened? Is that correct? Excuse me? Do I disagree with? He disagreed with Dr. Grossman's notes as far as the history of his ailments. I'm sorry. Who disagreed with that? I'm sorry. Dr. Grossman. He disagreed with. . . Dr. Grossman, I know, was the earliest treater with regard to this, and he later went on to treat with Dr. Collins and then with Dr. Cole. But I'm not sure what specific point the court is asking me with regard to Dr. Grossman's notes, but I don't think that there's any contention here with regard to the injury here or the fact the man had three surgeries, two performed by Dr. Collins, one performed by Dr. Cole, and nothing was really very successful. He was released. FCE said that he had a lifting restriction of 25 pounds, and Dr. Collins in his report of March 30, 2005, indicated he couldn't lift any more than 15 pounds, and that was the report where Dr. Collins indicated with regard to the school bus driving position, he was surprised he was doing that much, and felt that that was pretty much the limit of his physical abilities. As I said, we are here on a manifest weight and standard of review, and it's quite easy to argue a manifest evidence standard of review when your brief does not really address, and your introductory brief did not even address some of the evidence that was clearly supporting our position, such as, I mean, the introductory brief had no mention of Susan Entenberg's report or opinions whatsoever, no discussion of Dr. Collins' final opinions from 2005, and they don't even go into the fact that the job that Mr. Rausch took, the school bus driver job, was at the high end of the pay scale identified by Corvell and by Ms. Schmidt. Ms. Schmidt essentially, as I understand it, Corvell identified three areas that they felt he could work in, all low-paying jobs paying a maximum of $10. There's, I think, a house cleaner, some kind of a housekeeping or cleaning type job, security, or a delivery driver. And the highest was the delivery driver paying $6 to $10 an hour was the areas of work that he was identified as doing. Did his receiving a union pension and receiving social security disability, did that have any effect on his willingness or desire to get a job? Not that I know of. I mean, there's no facts here. So the facts are his physical abilities. He could not return to his past relevant employment, and two different vocational counselors, theirs and ours, the lady from Corvell, Ms. Schmidt, and Susan Denton-Burke, both indicated the job he took was at the high end. I mean, they said that he was at $10 an hour, was at the high end. Now, let's assume, for the sake of, one of their main arguments here, they were saying that Dr. Cole and others said that he should be working full-time. First of all, I have Dr. Cole's final report. It doesn't say anything here about whether he should be working full-time or part-time or anything like that. This report is 7-104. His principal finding, his most significant finding from my perception, was that his shoulder is far from normal with significant deficits. He's released with 25 pounds on the arm, and Dr. Collins has said he had an even lower restriction. Now, what did his job, what about his job requirements? His original job, he was a heavy equipment operator, and which would have, I believe, under the Dictionary of Occupational Titles that are referred to by Ms. Denton-Burke, had a much more significant lifting restrictions than this that he could not do. I thought it was conceded that as far as performing his past relevant employment, that he could not return to his past employment. Well, I don't think it was conceded by a closing counsel. I think she started out her argument that they had somebody that said, hey, let's look at the job requirements that he was performing, and though he had some disability, he was well within what he has left. He could certainly perform his prior job. So I'm not sure that sounded like the closing counsel was conceding that. I mean, you know, heavy equipment operator anymore today. Hydraulic, electronic, etc. sit most of the time. There is no question. I remember that there was testimony from Susan Denton-Burke. She could not return to that job, and she referred to the Dictionary of Occupational Titles. You have somebody who says that, but she also has somebody who says something opposite, right? Well, if that's so, then this is manifest way to the evidence. If one person says one thing and one another, and then commission goes one way, we are not in a position of reweighing evidence here. And I'm not sure she has somebody. Well, that's a different statement. You've criticized the closing counsel for what she didn't include in her brief, and now in your oral argument you're not acknowledging the other side and making your argument. You've got a commission decision in your favor. What do you have to show to prevail? What? That he could not return to his employment as a heavy equipment operator? I believe the testimony of Susan Denton-Burke was quite clear that he could not return to his employment as a heavy equipment operator. You have to basically show simply, as manifest way to the evidence case, right? Yes. That there's something here that's going to support the commission's decision. The commission pointed to both the report of Dr. Cole and the FCE in saying that he could not return to his employment. That was the commission itself pointing to evidence in the record indicating that he could not return to his employment. Well, of course, they know what they have to do. They've got to, whether it's a result-oriented decision saying we're going to compensate this fellow, now let's go comb that record and find something that can support that. Well, if they comb the record and they found it, then there is evidence in the record that supports our position. I'm not clear. I think the evidence was good evidence in the fact that they were pointing to both the FCE and to Dr. Cole, and they also could have pointed very clearly to Dr. Collins and to Susan Denton-Burke's opinions on the subject. And for that matter, even Ms. Schmidt was saying that his employment topped out at $10 an hour doing things like house cleaning and security guard and delivery driving, which are all jobs of much less physical demand level than the heavy equipment operator, which involves climbing up ladders onto heavy equipment and operating levers and the like. There's no question that there's lots of material in this record, both what the Commission did cite and what they didn't cite in the decision, that supports the fact that Mr. Rauch could not perform his relevant work. And the only other question was whether or not we established that there was a diminution in wage, and I thought we did that quite well as well. Certainly, Dr. Collins indicates, I mean, yeah, Dr. Collins indicates. That sort of attaches, I don't really need to belabor that, because if you test it now, it's poor fellow. The range that he ended up with, $10 an hour, was clearly within the range of their own expert's testimony. Yeah, it's within the range of their own expert's testimony. Furthermore, because of the maximums here, their argument is academic. Let's say he got a full-time job at $10 an hour. He's still going to have some differential, some impairment. The differential would have been the same because of the maximum. He, at the day he was injured, he was making $29.70. I thought he was making $39.70. Well, as of the date of the hearing, the union wage rate had increased to $39.20, and the statute provides a difference of what he would have been making in his job and what he could make. And the difference is so substantial between the $39.20 an hour and the $10 an hour that whether he was working at the $10 an hour 20 hours a week, making $200 a week, or $10 made 40 hours a week, making $400 a week, what they would be out in paying him in wage differential is exactly the same. That's why the argument is really moot on the issue of one of their big points here, that he should have been working full-time. Now, her argument is moot. He's working at the maximum of the scale, and whether it's working 20 hours or 40 hours, because of the maximums, it's the same amount of money they're out of pocket no matter what. Now, they further attack the commission decision in awarding him the eight and I think it's eight and one-seventh weeks of maintenance, saying that he was not cooperative. The evidence is quite contradictory on this point. As I indicated in our brief, I found, based on his testimony, their efforts said pro forma and pro functore. They just gave him lists, or they told him to make so many contacts per week, they had him draw up nice resumes so that he could go get jobs as house cleaning and security guard. Essentially, he said that he's living in Wisconsin, he has transportation difficulties because he has only one car that he has to share with his wife, and he could not go up to 90 miles away. Particularly, they gave him no leads where there was an actual job being offered or available. These efforts, by his testimony, and I think the commission cited to some of those issues, they felt his job performance was adequate and they felt within a reasonably short period of time of when he began working with Corvell, he found a job at the maximum end of the wage scale cited by Corvell and took it. And Corvell, and that was the end of it. One of the points they're trying to make is that there might have been a job available with Keno. Well, there was no such offer. What they did was they placed him for placement with Corvell. That seems, and as the commission indicated, that's a concession. What about that failure to show up and go on the panel with the union? I'm not sure what point in time that was, but there's no indication that he would have found, that they had no evidence, that he would have found a union position. And they're saying that there might have been a position available with Keno. Why didn't he get an offer of such a position? Instead, they placed him with… Well, I don't say they were saying with Keno. I mean, that's four years since a guy ever was working with Keno. He came to Keno through the union, and so they maintained the availability of operating engineers. So, I mean, it could be Walsh, it could be Capitani, it could be anybody. I'm not sure that there's any evidence… …call the union hall and look for somebody, and they're on the roster. There's no evidence that any light duty was available as a union position in this kind of field, especially given the fact that even… I mean, but you're characterizing their effort with both. Help is just resume stuff, but, I mean, geez, if he doesn't even show up to put his name on a panel to get what he used to be getting… There's no indication… …is there a way to cooperate? No. I don't think there's any… Why not? There's no evidence that anything was available. He's a heavy equipment operator, and that's in the union, and Corvell's own people are saying that he's employable as a house cleaner, a security guard, or a delivery driver. Why in the world is he going to put his name on a list for the kind of job he used to do when there's no evidence that such work was available? Thank you, counsel. Revelle? Just one point, Your Honors. Just to respond to counsel in his position that why go on a job interview or why go seek out employment if you don't have an offer available? Well, you can't get an offer of employment unless you go and make an application so that the potential employer knows who you are. The other personal issues, the commission even admits in their decision, they make a statement that he was not able to totally cooperate with vocational rehabilitation due to personal issues not related to the work injury. Obviously, there's been indication that he only had one car at this point. It clearly wasn't a problem when he was working before he was injured. I don't know what the circumstances are, but at the time that he's ready to and needs to comply and begin voc rehab, suddenly there's only one car between the two of them. That's a circumstance that is not part of what is the result of his work-related injury. And the fact that this gentleman refused to go and place his name on a light-duty roster, I'm sorry, it's just further evidence that this gentleman knew exactly what he was doing. There was no way he was going to put his name on a roster to even find out if there was a light-duty job offer available at the union hall, because it would have made that he would no longer be entitled to, at least to the level that he was receiving social security disability benefits, and it messed up his union pension. Unfortunately, you know, could I as the respondent have tried to get from the union on November whatever day that was, what was available at that moment? Obviously we didn't do that. That certainly would have been better or best evidence to substantiate this argument. However, the mere fact that he's refusing to even to try to go that route, he'd only been doing the part-time bus driver job for less than 60 days. He was in a part-time capacity, and that's not suitable employment. It was a voluntary decision on his part. He refused to even continue to look for and cooperate with VOC after getting the part-time job. And that is the basis that this is just contrary, it's contrary to the manifest weight because it never should have been decided in this way in the first place. Thank you, Your Honors. Thank you, Counsel. The court will take the matter under revised position.